call the next day. Mr Class, you may proceed. May it please the court Council. My name is Mario Clatus. I'm assistant appellate defender with the Office of the State Appellate Defender. I Mr Porter was convicted of armed violence and sentenced to 20 years in the Department of Corrections. Before his trial, he moved to quash his arrest and suppress the evidence in his case because it was discovered as a result of an unreasonable seizure. An appeal. Porter argues the trial court wrongly denied his motion to suppress because the officers in his case did not reasonably suspect he committed a crime or that he was armed and dangerous when they stopped him for questioning and grabbed him to frisking for weapons and that the officers discovered the evidence in this case as a result of the seizure. We maintain that the officers did not lawfully stop Mr Porter, but because time is scarce, I'm going to focus on the argument that the officers did not reasonably suspect he was armed and dangerous. Of course, I'm happy to answer any questions the court might have about the first half of this issue. Our state and federal Supreme Court recognized that protective frisks are humiliating, frightening experiences that arouse strong resentment and officers may conduct carefully limited searches of an individual's outer clothing to discover weapons that might be used against officers, but only when they reasonably suspect the individual is armed and presently dangerous. Evidence gathering is not a lawful basis for a frisk. Moreover, whether the frisk is lawful is a separate question from whether any stop was lawful. Even if the officers reasonably suspected the individual was involved in criminal activity, they can only frisk him for weapons if they also reasonably suspect he was armed and presently dangerous. Courts apply an objective standard to determine whether a frisk is lawful. The test is whether a reasonably prudent person under the circumstances would have justifiably feared for his or others' safety. The officers must provide specific, articulable facts that support the frisk. On the other hand, officers' subjective beliefs regarding the safety of a situation are relevant to the analysis. If the officers subjectively feared for their safety, the seizure is more likely to be found reasonable. If they did not subjectively fear for their safety, though, the seizure is less likely to be reasonable, especially in cases where officers essentially acknowledge that they had no reason to believe a defendant was armed. What do we have here in terms of that subjectivity? The officer in this case pointed to nothing. He never said he feared for his safety. He stated that when he grabbed my client, everything was fine. He pointed to nothing at the time that would have indicated why he feared for his safety. And again, he never said that he feared for his safety when he grabbed Mr. Porter to frisk him. But you would agree if he had, you wouldn't be making that argument? I probably would not be. I mean, whether he subjectively feared the situation would be relevant to the analysis this court applies. But all it takes is his statement. I don't think it is. Are you asking me if whether all it takes is his statement that he feared to make the search reasonable? No. Okay. But in terms of that's the only way we can get at subjectivity. I guess he would have to say, yes, I feared for my safety. In Porter's case, there were no specific articulable facts that justified the protective frisk under the circumstances. Therefore, it was unreasonable for the police to grab Porter and frisk him. First, the officers were not investigating a crime that likely involved an armed suspect. The facts known to the officers at the time indicated that a woman named Jasmine Watts was sleeping on her couch. She woke up at 329 a.m., saw a man shining a cell phone light at her. The man left the room immediately. She never saw him again. Half an hour later, Officer Denise White and Sergeant Paul Segros spoke to Watts. There was no report of a weapon, no reported physical harm to Watts, and no reported threats toward Watts. Sergeant Segros and Officer Jacob Beck, who obviously outnumbered Porter, subsequently found Porter at an open convenience store about a mile away. Porter was doing nothing illegal when the officers spotted him. According to their testimony, he was walking toward a checkout counter or standing in line to pay for something. According to the officers, when Porter saw them, he either walked toward a door on the opposite side of the store or backpedaled slowly toward the door, neither of which could have indicated that he was armed or dangerous. Officer Jacob Beck exited his patrol car. He approached the store's west door and gestured to Porter to step outside. According to Officer Beck, Porter complied with this request. He held that Beck held the door open for Porter, and Porter exited the store at a normal gate. As Porter walked toward Beck, Beck acknowledged that Porter did not reach for his pockets or make any other similarly suspicious movements. Beck also acknowledged that he had no information that he was looking for an armed suspect. Furthermore, Beck's testimony showed he did not subjectively fear for his or other's safety. He testified that everything was fine when he grabbed Porter. Despite that, as soon as Porter stepped outside, Beck grabbed Porter's wrist and, as Beck put it, placed him in a lock, conducting a pat-down for weapons for officer safety purposes. We don't know the precise nature of the lock that Beck applied, but Officer Segros testified that Beck's grip on Porter was so strong that he never broke his grip on Porter. The officers testified that Porter pulled his hand away from Officer Beck and twisted away from Officer Beck when Beck grabbed him. When Officer Porter pulled away, a struggle ensued that lasted a matter of seconds. A gun fell from Porter's person. The officers arrested him and found cocaine during the search incident to arrest. On appeal, the state argues the propriety of Beck's grabbing Porter is irrelevant because the gun fell from him before the pat-down began. However, Beck grabbed Porter and put him in a lock to pat him down for weapons. And the propriety of Beck's grabbing Porter is therefore relevant to whether the trial court should have suppressed the gun. On appeal, the state compares Porter's case to people v. Staples. Porter's case differs from Staples in crucial ways. First, in Staples, the police were investigating a series of robberies, at least one of which involved a gun. In Porter's case, there was no report of a weapon, no report of any threatened or sexual violence. And Officer Beck indicated he had no information that he was looking for an armed suspect. In Staples, the officers initiated a frisk because the defendant reached for his pocket or moved his hand around his coat when they approached him. In Porter's case, Officer Beck acknowledged that Beck did not reach for his pockets or make any similar suspicious movements. Finally, in Staples, the defendant appeared extremely nervous. Officer Beck never said this about Porter, and he indicated that everything was fine when he grabbed Porter. Because the officers did not reasonably suspect Porter was armed and dangerous, when Beck grabbed him and initiated the weapon search, Beck's physically seizing Porter violated the Fourth Amendment prohibition against unreasonable seizures. Because the gun and the cocaine were discovered as a result of this seizure, the trial court should have suppressed the evidence. You're assuming it's a weapon search because you're saying the purpose of the officer who grabbed Porter testified that he grabbed him to pat him down for weapons. Yes, yes. It's the record's unambiguous about why Beck grabbed Porter. Porter respectfully asked his court to reverse the trial court's decision to deny his motion to suppress because without this evidence the state could not approve its case against him beyond a reasonable doubt. Court, is there any questions? I don't believe there are. Thank you. Mr. Arado, you may respond. Please, the court. Good morning, Your Honors, counsel. Just as a preliminary matter, this brief by the people was written by a person who has taken leave of absence from our office. Therefore, I've taken the oral argument for this case. I have not reviewed the record. It was not available to us. We had called. Anyway, so I'm limited to what the briefs are indicating. The primary focus seems to be on whether or not the defendant was grabbed and that there was going to be a pat-down search. There was testimony that maybe that was the intent of the officer. He never got to that point. In fact, there was also other testimony that he was taking hold of him to escort him to another, to the wall alongside the convenience store. And the trial judge in his written findings stated the officer, words were spoken, the officer took hold of the defendant's wrist to escort him to the side of the building whereupon the defendant attempted to free himself by playing away. Well, now, again, we have him in a store, right? And he's approached and they say they want to talk to him? Yes. What happens, I mean, the total scenario, if you want, the total scenario, Officer Seagrove had discovered, had been responding to the scene of the home invasion. Right, and he's reporting to another officer, sending it out? He just sees somebody who he later discovers is matching the description, and he actually calls in that description. He arrives at the home invasion, is told by the victim the description, which he says fits what he saw of this person walking down the street. So he gets into his car and they go down to the store. Officer Beck is at the front entrance, Seagrove is at the back entrance, Beck testifies, he approaches the front door, defendant sees him and starts backpedaling away from him towards the back of the store. Turns around, sees Seagrove, then turns back towards Beck, and Beck says, motions for him to come forward. He does come forward, and then Beck opens the door, defendant comes out, grabs the wrist, and Well, let's talk about that grabbing the wrist. What's that all about? Well, it's to gain control of the defendant. For what purpose? Well, for the purpose of, the trial court found, to talk to him, to escort him to the side of the building. That was the finding of the trial court. And this court would have to find that it was against the manifest way of the evidence to overrule that. The trial court, in its conclusions of law, speaks only to the being enough for the Terry step. They don't go to the issue of whether or not it was a reasonable belief that he was armed and dangerous, such that they would be able to go immediately to the next step. They haven't even begun any investigation yet. They haven't begun any questioning of this man yet. And I do not know what the arguments were below as far as whether this actually should have been a forfeiture argument. Perhaps they never argued at that point. The judge said, well, it doesn't matter. Well, I can tell you what the judge said. The gun was never seized from the defendant person in any event. It fell out as he attempted to flee. I really have a problem here. The gun is light years away from where my issue is. He's following an officer's direction, come here, I want to talk to you, and he's just grabbed. There's nothing in the law that says you can't take control of a defendant in order to escort him to a place where they want to talk to him. I see nothing in the record to indicate that there was any other reason for the Pantheon to talk to him about what happened. But we never got to that point. The defendant almost immediately started to struggle. And even though they say it was seconds, the testimony was 10 to 15 feet they got during the struggle, and they ended up near the gas pumps. In fact, Officer Seguro said, hey, I got my taser out, but I didn't want to use it because I was afraid the gas pumps were right there. What time of night is this? This is at 3.50 in the morning, so this is somewhat unusual. As Seguro says, when he initially saw the defendant, it was a matter of, this is kind of weird, he's walking, it's raining out, he's walking in the rain, apparently no umbrella, there's no indication that... Another point, he's walking on the side of the street but there's no residences. The defense has requested the court to take judicial notice of Google satellite images. We say it's inappropriate for this court to consider that because, first, those were not offered up for the trial judge to consider when he's making his decision. Second, satellite images are basically photographs, and there's no foundation for what the time of day was, whether that location even looked the same as when that satellite image took place. What would be the purpose of all of that? I just want to address that. What's the purpose? To see that there are some houses nearby, I guess. Still, we don't know what the... Doesn't a citizen have the right to walk in the morning in Peoria down the street? Yes they do, but if they're within close proximity to a crime scene and they fit the description of the perpetrator, then no, perhaps they don't have the right to be walking down that street without the police being able to stop them. Grab them? And grab them. We would submit and... Engage in a physical altercation? No, it was defendants doing the altercation. No, the defendant was touched, right? Grabbed? Sure. Going out the door? He was a suspect in a minimum burglary. Do we have an officer testifying? As I'm holding the door to this gentleman who is obeying my command to come out here, I want to talk to you, that he thought he would just run away? Because of the furtive movements, yes. He backed away from the officer, was heading towards the back door. Okay. So he was concerned, I believe there might have been some... Was there testimony of that? Yeah, I don't recall. That he bolted the door? He bolted out the door that the officer was holding for him. As a fine gentleman, allowing him to come out. I would ask the court to put up the record on that particular point. That's fair. Thank you. Bottom line is, we don't believe there was any error in the trial, judges. Both findings of fact and his conclusions of law. Therefore, we would request that this court confirm the infestation of the child. I don't think there are any more questions. Thank you, Mr. Arrano. Mr. Klanisch, you may reply. Just briefly, your honors. I want to make very clear that the record is unambiguous. Officer Beck grabbed him to search him for weapons. He did not grab him to control him. Beck testified. He acknowledged that Porter exited the store at a normal gate. He had already complied with a gesture, which, whether it's a command or a request, Porter did what he asked. He walked out the store at a normal gate. He acknowledged Porter did nothing that indicated he was... He did not say Porter looked like he was about to run. I want to briefly... The furtive movements the judge referred to, it wasn't clear what the trial court judge referred to when he used the phrase furtive movements. Was that the backing up? If it was the backing up, the backing up occurred before the police had even communicated with Porter. They hadn't so much as pointed at him. They arrive at the store. Officer Beck testifies. He starts to back up slowly. He's not seized. Well, here's a guy who fits a description of... Yes. ...that they were told. Yes. But he hasn't... They arrive before they could say something. He starts backing up away, and then he sees the other officer. Yes. He starts backing up, but he's not seized at that point. They haven't given him any commands or communicated with him in any way. He's perfectly free to go on his way. So he spotted both officers, the front and back. I don't know why he backed up. I know that he was free to go on his way at that point, though. Until the officers, in some way, communicate with him, he's free to go on his way. And I'd like to point out, we're not talking about headlong flight here. I mean, when he was facing the wrong direction, but also, he wasn't running fast enough for this to be headlong flight. He backs away when he sees the police officers pull up suddenly at the convenience store. And again, as far as Officer Beck possibly grabbing him forcefully enough that he could never break free to gain control, there was no testimony from Beck that indicated he even subjectively believed he needed to do that to control Porter. He testified, Porter exited the store to normal gate, I held the door open for him, everything was fine. And then he put him in a handlock. And then he put him in a handlock. And again, we don't know the precise nature of the lock. We know it was really strong, though. At least from the other officers' testimony. Does it make a difference if it's strong or not strong? I think the stronger it gets, the more unreasonable it becomes. But it is reasonable. I think Mr. Rado is saying that it's reasonable for the officer holding the door open, allowing him to exit. It's reasonable for the officer, under all these circumstances, to actually come in physical contact with him. I would have to disagree with that. The seizure has to be reasonable under the circumstances. I don't see the circumstances in this case that would have indicated it was reasonable for Officer Beck to grab him suddenly and forcefully in that manner. He was complying with Officer Beck's instructions. Officer Beck could have told him, you know, go up against the wall or something. He could have said anything to him. He didn't. He testified clearly, I grabbed him, placed him in a lock, comma, conducting a pat-down of him for weapons for officer safety purposes. This guy who fits the description. This guy who fits the description, according to the officers. There were some parts of the description Porter didn't match. But setting that aside, I assume grabbed him because he thought he fit the description. Is that sufficient just because he fit the description that you can come in physical contact and grab someone? I do not believe so. I do not believe so. Does the law say that? I don't believe the law says that. It has to be reasonable under the circumstances. If Beck had indicated, I did something that indicated objectively he was about to run, maybe we'd be talking about something different. He testified that Porter did what he asked. Porter walked out the door. I keep saying normal gait because there's nothing about it. The normal gait is I believe the defense attorney's question but Beck said yes when he was asked did he walk out at a normal gait. There was nothing about Beck's testimony that indicated Porter. Once Porter complied with the instruction to come to the officer, there was nothing that indicated Porter was about to run. So the best the trial judge could hang his hat on in this case would be the backing away in the store. Yes. Which again could not have indicated he was armed and dangerous. Which is what the officer needed if he was going to grab him to frisk him. Doesn't the judge find that that activity of the backpedaling is one of the indications that there's criminal activity which would allow them to even stop him and ask some questions. Yes. The judge is finding does it say anything about armed and dangerous? I don't believe so. I believe at the end of the judge's order he said something to the effect that the officer reasonably suspected there was criminal activity of foot thereby justifying the pat-down. I believe it's one of the last sentences in the judge's order. I don't believe that's a correct reading of the law. That is for this court to decide. Again I would just like to ask the court to reverse the court's decision on the motion to suppress and therefore to reverse Porter's conviction because without the evidence in this case the state could not have proved his case against him beyond a reasonable doubt. Thank you, Your Honor. Thank you, Mr. Gladys. Thank you, counsel, both for your arguments in this matter. It will be taken under advisement under the disposition that we'll issue. We'll stand at brief recess for a panel change.